839 So.2d 807 (2003)
Javis L. SIMS, Appellant,
v.
STATE of Florida, Appellee.
No. 4D01-4300.
District Court of Appeal of Florida, Fourth District.
March 5, 2003.
*808 Carey Haughwout, Public Defender, and James W. McIntire, Assistant Public Defender, West Palm Beach, for appellant.
Charlie Crist, Attorney General, Tallahassee, and Donna L. Eng, Assistant Attorney General, West Palm Beach, for appellee.
HAZOURI, J.
Javis Sims (Sims) was charged with fleeing or attempting to elude a marked police car and driving while his license was revoked. After a jury trial, he was found guilty on both counts. The trial court entered a judgment in accordance with the jury verdict. Sims was sentenced to five years, with credit for time served, to be followed by five years probation. We reverse the judgment and sentence and remand for a new trial.
The charges against Sims arose from an incident allegedly occurring on July 25, 2000. On that date, police officer Michael Kelley allegedly saw Sims driving a Chevy Malibu (Chevy). Officer Kelley was not on duty and was driving his personal vehicle, an S.U.V. He was driving in the same direction as Sims, first behind him and then next to him. Sims was the only person in the vehicle. Officer Kelley recognized Sims because he had casual contact with Sims prior to July 25, 2000, and believed that Sims had his driver's license revoked. Officer Kelley called in the name and tag number of the car. He also radioed for marked police units to respond to the area. The tag that Officer Kelley called in was registered to Dora Byrd, Sims' wife.
Officer Kelley saw Sergeant Tom McCabe and Deputy Chief Immler respond to his call. The Chevy was stopped at a red light. Deputy Chief Immler got out of his vehicle, an unmarked Crown Victoria, and approached the Chevy. He was wearing his police uniform and asked the driver (alleged to be Sims) to produce his driver's license and vehicle registration. The driver reached over into the glove compartment and then accelerated his vehicle and proceeded down the road. *809 Deputy Chief Immler testified that he had eye contact with the driver for less than a minute and could only generally identify him as a black man with dreadlocks in his late twenties or early thirties. Deputy Chief Immler got back into his vehicle and attempted to pursue the Chevy. He saw the Chevy make a U-turn and go through two red lights, but the Chevy disappeared out of sight. He did not continue to pursue the vehicle due to heavy traffic. Sergeant McCabe was on road patrol at the time and also responded to Officer Kelley's call. He observed the sequence of events, but similar to Deputy Chief Immler could identify the driver only as a black male with long dreadlocks. At trial, neither Deputy Chief Immler nor Sergeant McCabe could identify Sims as the driver.
On August 4, 2000, Officer Kelley, while on patrol, saw Sims in a parking lot of a convenience store. He allegedly observed Sims get into a 1992 Chevrolet, back the vehicle up, and park it. Officer Kelley testified that this was a different car than the one he saw Sims in on July 25, 2000. However, the tag was the same. Officer Kelley arrested Sims based on the July 25, 2000, incident.
Prior to the commencement of the trial, Sims filed a motion in limine to prohibit the introduction of "Law enforcement testimony regarding the observation of Defendant unlawfully operating a motor vehicle on August 4, 2000 or at any time prior or subsequent to the present charges." Sims argued that the testimony was not relevant to the offenses at issue and would substantially prejudice him. He also argued that the State had not given notice of "similar fact" evidence. See § 90.404(2)(c)1, Fla. Stat. (2000).[1] At a hearing on the motion, Sims argued that since he was not charged for any actions occurring on August 4, 2000, any testimony by the police officers that Sims was driving a vehicle on that date should be considered similar fact evidence of other crimes and was offered only to prove Sims' propensity to commit the charged offense. The State argued that the arrest on August 4, 2000, and Sims' conduct during the arrest is intertwined with the charged offenses and is relevant to Sims' identity since the tag on the car that Sims was allegedly driving on August 4, 2000, was the same tag on the vehicle on July 25, 2000. The trial judge denied Sims' motion in limine.
During the opening statement, the State told the jury that ten days after the alleged incident, Officer Kelley saw Sims driving a different vehicle with the same tag as the vehicle the officers attempted to stop on July 25, 2000. Sims objected, but the trial judge overruled the objection. The trial judge ruled that the State could elicit evidence that Sims was driving a car with the same tag of the car that he was charged with driving on July 25, 2000. However, the State could not argue that Sims' driving on August 4, 2000, was a crime.
At trial, Sims contended that he was not the man driving the Chevy on July 25, 2000. He argued that the description given by the police officers could identify many people, including both his brother and his stepson, also tall black males with dreadlocks and who both had access to the Chevy. Sims also presented testimony from two alibi witnesses, Curtis Williams and Ernest Nixon, both of whom testified *810 that they were with Sims on July 25, 2000, and that they were fishing in Pahokee, which is "no where near" where Officer Kelley allegedly saw Sims driving the Chevy.
Prior to Ernest Nixon's testimony, the parties addressed the State's anticipated impeachment. The State had a copy of paperwork with a seal from the Clayton County State Court in Georgia, showing that Nixon pled guilty to the crime of dishonesty or false statement, was placed on probation, and had an active warrant in Georgia for a violation of probation. Nixon told the court that he had pled guilty because he was forced to, but that no one had told him he was convicted. He stated that he thought that he was never convicted and since he was on probation, he thought the case was still open. Sims argued that without proof of a conviction, the State could not impeach. The trial court determined that the jury was entitled to know that Nixon pled guilty and was placed on probation for the crime of giving a false statement because it reflected on his credibility. The trial court also stated that Nixon was free to deny it.
Nixon, who is Sims' first cousin, testified that on July 25, 2000, he was fishing with Sims all day. During cross-examination, the State tried to impeach Nixon by asking him if he had ever pled guilty and been convicted of a crime involving dishonesty. Nixon answered, "Yes." Defense counsel failed to renew his objection to this impeachment and, in fact, during re-direct examination elicited from Nixon that the crime he pled guilty to occurred in 1998 in the State of Georgia, and that "the police officer said I gave him a wrong name." He further stated that he did not know whether he had actually been convicted of the offense.
Dora Byrd Sims (Sims' wife) testified. She stated that both her son and Sims' brother fit the general description given by the officers and that she often lends her vehicles to them to drive to and from school. She also testified that it was not Sims driving the Chevy on July 25, 2000. Sims, himself, took the stand and testified that on July 25, 2000, he was fishing with some friends and that he did not learn about the incident in which he was allegedly involved until he got home. He acknowledged that he had previously been convicted of "approximately four felonies."
Sims contends inter alia that the trial court abused its discretion by allowing the State to present evidence that Sims was seen driving a car with the same tag number, on August 4, 2000, the day he was arrested. He argues that the evidence is irrelevant to the identity of the driver on July 25, 2000, and that the State offered it only to prove his propensity to drive with a revoked driver's license. We agree.
The admissibility of collateral crime evidence is within the discretion of the trial court and its determination shall not be disturbed absent an abuse of that discretion. See LaMarca v. State, 785 So.2d 1209, 1212 (Fla.2001).
The Florida Supreme Court addressed the standard for admission of collateral crime evidence in Williams v. State, 110 So.2d 654 (Fla.1959). "Our view of the proper rule simply is that relevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime. The test of admissibility is relevancy." Id. at 659. This rule is codified in section 90.404(2)(a), Florida Statutes (2000), which provides that the state may introduce similar fact evidence of other crimes or acts when it is relevant to prove a material fact in issue like identity, preparation, motive, intent, opportunity, plan, absence of mistake or accident, or knowledge. However, similar fact evidence is inadmissible when the evidence is relevant solely to prove bad character *811 or propensity. See Kulling v. State, 827 So.2d 311 (Fla. 2d DCA 2002).
Pursuant to the trial court's ruling on Sims' motion in limine, the State could present evidence that Sims was driving the vehicle on August 4, 2000, with the same tag, but not that it was a crime.[2] Sims argues that the testimony that he was driving a vehicle with the same tag on August 4, 2000, does not make it more likely than not that he was the driver of the vehicle on July 25, 2000, and therefore is not relevant.
The State argues that the testimony is relevant to establish identity. A mere general similarity will not render the similar facts legally relevant to show identity. See Miller v. State, 791 So.2d 1165, 1169 (Fla. 4th DCA 2001). There must be identifiable points of similarity which pervade the compared factual situations. In order for the similar facts to be relevant, the points of similarity must have some special character or be so unusual as to point to the defendant. Id. at 1170. In the instant case, the only similarity is the tag number on the vehicle. The factual circumstances are completely different. On August 4, 2000, it was a different car, parked in a different location at a different time of day. Also, Sims was not contesting that the tag was registered to his wife. The fact that he may have been driving a car with a tag registered to his wife is not so unusual that it means he was the only one who could have driven the Chevy on July 25, 2000. In Stephens v. State, 662 So.2d 394 (Fla. 5th DCA 1995), the fifth district held that the fact that a collateral crime witness can identify the accused is insufficient. "Instead, the points of similarity must have some special character or be so unusual as to point to the defendant." Id. at 395. "Moreover, the degree of uniqueness required to admit Williams rule evidence as proof of identity is `fingerprint' type of evidence." Id.; see also Miller, 791 So.2d at 1170. In the instant case, the evidence does not rise to the level of uniqueness that is necessary in order to be admissible to prove identity.
The State argues that even if the trial court erred in admitting the evidence, it was harmless error. Evidence is harmless if the state can prove beyond a reasonable doubt there is "no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986); Goodwin v. State, 751 So.2d 537, 542 (Fla.2000) (reaffirming DiGuilio and its applicability to error such as the improper admission of collateral crime evidence). The admission of improper collateral crime evidence is presumed harmful error because of the danger that a jury will take the bad character or propensity to commit the crime as evidence of guilt of the crime charged. See Rivera v. State, 745 So.2d 343, 344 (Fla. 4th DCA 1999). A violation of the Williams rule may be considered harmless only where the State has proved beyond a reasonable doubt that the violation did not contribute to the verdict.
In the instant case, it is not clear that Sims would have been found guilty without the collateral crime evidence. The testimony was conflicting and the only evidence linking Sims to the crimes charged was Officer Kelley's testimony and the evidence that he was seen driving a car with the same tag on August 4, 2000. As in Kulling, because the collateral crime did not meet the strict standard of relevancy in this case, the trial court abused its discretion in allowing the State to introduce *812 similar crime evidence. It cannot be said that the admission of this evidence was harmless error because identification of Sims as the perpetrator rested on the testimony of a single witness. Therefore, the State has failed to prove beyond a reasonable doubt that there was no reasonable possibility that the error contributed to his conviction.
We recognize that the State concedes that the trial court erred in allowing the State to impeach the alibi witness, Ernest Nixon, without proof that a judgment of conviction was entered in Georgia. However, we hold that it was not preserved for appellate review. Therefore, we do not rely on this error as additional grounds for reversal. Although the defense moved in limine prior to Nixon's testimony and requested the trial court to not allow the anticipated impeachment, the defense did not make a contemporaneous objection during the actual impeachment. See Shaw v. State, 824 So.2d 265 (Fla. 4th DCA 2002); Thomas v. State, 424 So.2d 193 (Fla. 5th DCA 1983). In addition, on re-direct examination Sims chose to have Nixon identify the nature of the crime (giving a police officer a false name) which the state had not elicited in its cross examination. This court cannot ascertain whether after hearing Nixon's testimony, Sims decided that he did not want to oppose admitting the evidence. See Shaw, 824 So.2d at 268. In order to preserve the issue for appellate review, it was necessary for Sims to renew his objection during Nixon's testimony. Having concluded that the error was not preserved, we do not address the State's contention that it is harmless error.
Sims' final point on appeal is that the cumulative effect of ineffective assistance of his trial counsel in failing to object to numerous improper statements made by the prosecutor in his final argument denied him due process of law. As support for this argument, Sims draws the court's attention to approximately twenty statements made by the State during closing argument.[3] We do not need to address this issue because we reverse on other grounds and a claim of ineffective assistance of trial counsel is more appropriately raised in a rule 3.850 motion for post-conviction relief. However, we recognize that many of the statements were improper and had objections been made, they should have been sustained. As this court noted in Jones v. State, 730 So.2d 346 (Fla. 4th DCA 1999) (reversing a conviction for improper final argument), we again remind the State that its prosecutors should be mindful of not letting their zeal in seeking a conviction overshadow their responsibility to seek justice. We caution the State to avoid these improper arguments in a future trial.
REVERSED.
FARMER and STEVENSON, JJ., concur.
NOTES
[1] When the state in a criminal action intends to offer evidence of other criminal offenses under paragraph (a) or paragraph (b), no fewer than 10 days before trial, the state shall furnish to the defendant or to the defendant's counsel a written statement of the acts or offenses it intends to offer, describing them with the particularity required of an indictment or information. No notice is required for evidence of offenses used for impeachment or on rebuttal.
[2] Although the trial court prohibited the State from referring to the events of August 4, 2000, as being a crime, the clear implication is that Sims was driving another vehicle with the same tag while his driver's license was revoked, which itself is unlawful.
[3] The State's improper statements include: telling the jury that its verdict should be based on whether Officer Kelley was telling the truth or lying; instructing the jury to choose the side that's more credible and believable; embellishing Officer Kelley's testimony by stating that he is not an officer who is trying to lie or embellish; embellishing Officer Kelley's testimony by stating that he was not impeached; telling the jury that they were told a "fish story" by the defense; and instructing the jury that it should base its verdict on which side they believed more.